**REGENT JACK MANUFACTURING CO., Inc.**

v.

**UNITED STATES.**

No. 433–57.

United States Court of Claims.
July 19, 1961.
Rehearing Denied Nov. 1, 1961.

Madden and Whitaker, JJ., dissented.

John F. Pearne, Cleveland, Ohio, for plaintiff. Ely, Pearne & Gordon, Cleveland, Ohio, Martin E. Hogan, Jr., and Stevens, Davis, Miller & Mosher, Washington, D. C., were on the brief.

Lewis A. Rivlin, Washington, D. C., with whom was Asst. Atty. Gen. William H. Orrick, Jr., for defendant.

PER CURIAM.

This case was referred pursuant to Rule 45, 28 U.S.C., to Donald E. Lane, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusion of law. The commissioner has done so in a report filed October 25, 1960. Briefs were filed by both parties, exceptions to the commissioner's findings were taken by the defendant, and the case was submitted to the court on oral argument by counsel. Since the court is in agreement with the findings and recommendations of the trial commissioner as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. It is found that plaintiff's reissue patent No. 24,230 is valid, and that claims 2, 6, 10, 14, 15 and 16 thereof have been infringed by defendant without license of the patent owner. Plaintiff is, therefore, entitled to recover and judgment will be entered to that effect, with the amount

of recovery to be determined pursuant to Rule 38(c).[1]

It is so ordered.

■ This as a patent suit under the provisions of Title 28 U.S.C., Section 1498, in which plaintiff seeks to recover reasonable and entire compensation for the unlicensed use of a patented invention. Plaintiff also seeks damages under Title 35 U.S.C., Section 284, and attorney fees under Title 35 U.S.C., Section 285. The Court of Claims is specifically authorized under Title 28 U.S.C., Section 1498, to award "reasonable and entire compensation," but is not authorized to award specific damages and/or attorney fees as such in these cases.

Plaintiff is a corporation of the State of California and is the owner of United States Reissue Patent No. 24,230, issued October 23, 1956, entitled "Portable Lift". Plaintiff charges infringement of claims 2, 6, 10, 14, 15, and 16 of said reissue patent by certain axle jacks made for and procured by the United States. The parties agreed to a separation of issues for trial. The questions of infringement and validity of the selected patent claims are now before the court.

Plaintiff's reissue patent 24,230, and the original patent 2,734,716 on which the reissue is based, relate to hydraulic jacks mounted on wheels for use in elevating heavy aircraft by engagement with a portion of the aircraft landing gear. The several patent claims in suit, together with portions of the reissue patent specification and drawings, are included in the accompanying findings. The parties have stipulated that certain accused axle jacks were manufactured for the United States by Smith-Nelson Corporation in accordance with three drawings identified in finding 29, and that the United States procured a number of such jacks for use.

Analysis of the patent claims in suit shows that each recites a combination of parts and elements, and each covers a jack construction illustrated in one or more of the three Smith-Nelson Corporation drawings. The accused axle jacks include all the parts and elements set forth in claims 2, 6, 10, 14, 15, and 16 of the reissue patent, and those accused parts and elements function generally in the same manner to produce the same results described in the patent. A specific application of the patent claims to the accused constructions is set forth in findings 32 through 41, and will not be repeated in this opinion.

Defendant has contended that the doctrine of intervening rights precludes a recovery herein because accused Smith-Nelson Corporation axle jacks were manufactured prior to the issue date of plaintiff's reissue patent. The effect of reissue patents is stated in Title 35 U.S.C., Section 252, which reads in part:

" * * * No reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent, to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. * * * "

■ Each of the three accused constructions is found to infringe claims 2 and 6 of the reissue patent, which two claims were also in plaintiff's original patent and are valid. Under these circumstances, no intervening rights accrued to the United States or its supplier.

■■ Defendant has contended that the doctrine of double patenting renders plaintiff's patent invalid. The application for plaintiff's original patent was filed on January 17, 1952. The application for plaintiff's design patent was filed on June 26, 1952. The design patent 168,473 issued to plaintiff on December 23, 1952 for a 3½-year term expiring June 23, 1956. The original patent 2,-

---

1. See dissenting opinion by Judge MADDEN, in which Judge WHITAKER joins, which follows the commissioner's opinion.

734,716 issued to plaintiff on February 14, 1956, and was surrendered when reissue patent 24,230 issued to plaintiff on October 23, 1956, on an application for reissue filed June 1, 1956. Defendant has contended that the expiration of plaintiff's design patent 168,473 on June 23, 1956, released or dedicated to the public the subject matter of plaintiff's original and reissue mechanical patents. This contention is unsound here and would be correct only if the invention defined and claimed in the reissue patent was disclosed to the public in the expired design patent. The evidence herein shows that plaintiff's design patent and plaintiff's reissue patent are for *different* inventions, i. e., they do not cover the same inventive act. The design patent relates to the visible features constituting the external appearance of a jack construction. The mechanical reissue patent relates to a stated combination of constructional details which combination may be manufactured *without* employing the patented design. The accused Smith-Nelson Corporation axle jacks do not have the same external appearance covered in plaintiff's design patent, but they do include the several features recited in the patent claims in suit. Where one procures a design patent and subsequently procures a mechanical patent, the second patent is not void for double patenting unless it is necessary to use the design disclosed in the design patent to make use of the mechanical invention defined in the patent claims of the later mechanical patent. If the design includes ornamental features which go beyond and are patentable over the structural features as defined in the claims of the mechanical application, the inventor is entitled to two patents. In re Dubois [and Will] Cust. & Pat.App., 1958, 262 F.2d 88. The design patent does not disclose or teach to the art the combination of parts and elements disclosed and claimed in the mechanical patent here in suit. The doctrine of double patenting is not applicable here. It is also noted that the design patent application was filed subsequent to the filing of the original mechanical patent application and was copending therewith in the United States Patent Office. The design patent is not prior art against the patent in suit.

■ Defendant has contended that the United States has a license under the patent in suit, and that such a license may be predicated on contract AF 33(600)–19371 between plaintiff and Air Force and/or on some theory that the *idea* of vertical shiftability was either developed by the defendant or developed by plaintiff at the suggestion of the defendant or in response to a problem raised by defendant. Plaintiff's contract with the Air Force was entered into as of June 2, 1952, for an engineering design study of jack assemblies and for the delivery of one jack assembly in each of five stated capacities to Wright-Patterson Air Force Base. Plaintiff's original application for patent on which claims in suit are based was filed in the United States Patent Office January 17, 1952, nearly 5 months before the Air Force contract was effective. The standard patent clauses in this Air Force contract concern inventions made in the performance of work called for under the contract or done upon the understanding that a contract would be awarded. The earlier conception and reduction to practice of the invention defined in the patent claims in suit were not done under either of said conditions. There is no competent evidence that the invention in suit was developed in anticipation of a contract to develop it for defendant or in response to any specific suggestions made by any employee of defendant. The United States does not have a license, implied or in fact, under the patent claims in suit.

Defendant has contended that the patent in suit is invalid in view of prior patents, particularly Sonderup 2,173,598 and/or Grime 2,479,679. The Sonderup patent discussed in finding 11 discloses a jack having a carriage or frame which is wheel supported at only one end and which completely engages the ground when the jack is loaded. The Sonderup jack construction does not provide for movement of the jack with respect to the

carriage. The Grime patent discussed in finding 12 discloses a jack construction in which the frame under load engages the ground through foot plates while the load is supported on a lever type carriage slidable in the jack frame. Neither the Sonderup nor the Grime patent discloses a jack construction like or similar to the combination of structural parts and elements defined in the patent claims in suit. The patent statutes specify that a patent may *not* be obtained though the invention is not identically disclosed or described as set forth in section 102, *if* the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been *obvious* at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Title 35 U.S.C., Section 103. The differences between the subject matter defined in the claims in suit and the prior Sonderup and/or Grime patents are such that the subject matter as a whole would not have been obvious at the time the plaintiff's invention was made to a person having ordinary skill in the jack art. The claims in suit are not invalidated by the disclosures of the Sonderup and Grime patents. Nineteen additional prior patents have been referred to by defendant as showing the *state of the art,* and these are listed in finding 18. The patents in this collection do not disclose each and every element individually or in the combination specifically recited in the several patent claims in suit. It would not have been obvious at the time the invention was made to select a feature or features from each of several such patents for combination into the axle jack construction claimed herein. Any such a combination would be possible only by hindsight after knowledge of the construction disclosed and claimed in plaintiff's patent. Hindsight cannot support an assertion of obviousness. Zonolite Company et al. v. United States, 1957, 149 F. Supp. 953, 138 Ct.Cl. 114.

Defendant has also contended that the United States was *justified* in procuring the accused axle jacks which defendant alleges were constructed in accordance with Hawkinson patent 1,437,055, Hawkinson patent 1,489,759, and Manley patent 1,948,073. These three patents are included in defendant's 19 *state of the art* patents mentioned in finding 18. The disclosures of these three patents do not respond to any of the patent claims in suit. The Hawkinson patents do not show or mention hydraulic cylinder and piston mechanisms. The Manley patent disclosure is less pertinent than Grime patent 2,479,679, discussed in finding 12 and relied on by defendant as an alleged anticipation of the claims in suit. The alleged *justification* defense is without merit in the present case. The disclosures of the Hawkinson and Manley patents neither anticipate the patent claims in suit, nor render plaintiff's claimed invention obvious, nor justify the accused axle jack constructions.

Plaintiff is entitled to recover.

■ It is recommended that the court find that plaintiff's reissue patent No. 24,230 is valid, and that claims 2, 6, 10, 14, 15, and 16 thereof have been infringed by defendant without license of the patent owner.

MADDEN, Judge (dissenting).

I can see nothing in the plaintiff's patented jack which lifts it to the dignity of a patentable invention. It is not really claimed that there is even one new feature in the entire mechanism of the device.

Douglas Aircraft had the problem of obtaining a heavy-duty jack which could be operated in the narrow space between the wheels of certain types of Douglas airplanes. The lifting portion of the device could not be more than five and one-quarter inches wide, nor more than seven inches high.

Quite naturally, Douglas called upon the plaintiff, an experienced jack manufacturer, to solve the problem. The plaintiff had made many jacks for many purposes, and might fairly be expected to be able to devise one for this purpose.

So the plaintiff did devise a jack the lifting element of which had a base narrow enough to fit between the wheels and short enough to fit under the axle. It would seem that the man in the street would know that only a jack with such dimensions would operate in the stated conditions, and that an experienced jack manufacturer, whether the plaintiff or some other manufacturer, skilled in the art, would have a good idea as to whether a jack with a lifting device of such dimensions could be manufactured.

So far as the designing of the narrow and short lifting device, it seems plain to me that if Douglas Aircraft had happened to call upon any other experienced jack manufacturer to produce a jack of those dimensions, it would have gotten what it asked for. But when one takes a problem to a machine shop and says he needs a device which will do an ordinary job in an ordinary way, but that the device must be kept within certain narrow dimensions in order to fit into the work it must do, the machine shop is not an inventor when it makes a device which will fit the available space.

Having solved the problem of the narrow and low space by making the lifting device narrow enough and low enough to get between the wheels and under the axle, the plaintiff attached the lifting device to a portable frame long enough to reach under the plane without the operator having to crawl on the ground. To make the portable frame ten feet long instead of five is not invention. To make the hydraulic hoses long enough to reach from the pump handle to the lifting device is not invention. The valves, pumps, packing, ducts and reservoir were not different from those in common use.

Without further recounting all the things that were old, the question recurs, what was new? And the answer is, nothing at all, simply nothing. And I have no feeling whatever that I am exercising the prerogative of hindsight. Counsel at oral argument was asked to tell the court what was new about the device, and did not do so. Our experienced commissioner has not found that there was anything new in the device.

I think that to find patentability in a combination of well known elements, adapted to meet a need not fundamentally different from the needs that had been met in the past as they arose; to find patentability in a situation in which the problem had not baffled the art or the industry which had sought in vain for a solution, but in which the solution was forthcoming almost immediately after the problem was presented to anyone skilled in the art; to find patentability in such a situation is to cheapen the patent monopoly, which is meant to be reserved for genuine invention.

I would hold that the plaintiff's patent is invalid, in the light of the prior art.

WHITAKER, Judge, joins in the foregoing dissent.

### Findings of Fact

1. This is a patent suit under Title 28 U.S.C., Section 1498, for reasonable and entire compensation for the unlicensed use or manufacture by or for the defendant of certain inventions disclosed and claimed in United States Reissue Patent No. 24,230, issued October 23, 1956, in the name of Frank S. Pearne as assignor to Regent Jack Mfg. Co., Inc., plaintiff herein. The petition also notes Title 35 U.S.C., Sections 252, 281, 284, and 285, which relate to the effect of reissue patents, remedy for infringement of patent, damages adequate to compensate for infringement, and attorney fees. Plaintiff is a corporation of the State of California and has its principal office in Downey, California.

2. The patent in suit, Reissue 24,230, hereinafter referred to as the reissue, is based on original patent 2,734,716, issued February 14, 1956, in the name of Frank S. Pearne, assignor to plaintiff, upon an application for patent filed in the United States Patent Office on January 17, 1952. The application for the reissue of said original patent was filed on June 1, 1956. The recovery period, if any, under plaintiff's petition herein extends

from February 14, 1956 to September 10, 1957.

3. The reissue patent and the original patent which it replaces are both entitled *portable lift*. This subject matter relates more specifically to hydraulic jacks mounted on wheels and adapted for elevating heavy aircraft by engagement with aircraft landing gear. The general type of jack described and illustrated in the patent in suit has been sold by plaintiff under its trademark "Alligator" which has been registered in the United States Patent Office. The illustrative drawings of the reissue patent are the same as the drawings of the original patent and are reproduced at the end of this report.

4. The specification of the reissue patent reads in part as follows: (Matter enclosed in brackets appeared in the original specification but forms no part of the reissue specification; matter printed in italics indicates additions made by reissue.)

"* * * A general object of the invention is to provide a lift that is portable or mobile, being characterized by a wheel supported carriage, and the various essential elements of the structure are so combined and related as to provide a structure that can be easily operated or manipulated and which is particularly practical, effective and dependable for service such as lifting an element or unit of aircraft landing gear, or for performing other like or similar operations.

"Another object of the invention is to provide a lift of the general character referred to wherein the wheel supported carriage *comprises* [has] an elongate rigid frame *provided* with a vertically shiftable draw bar projecting from the forward end thereof and maintained in alignment with the *carriage* frame, while the forward end portion of the frame is supported by caster wheels and the rear end portion of the frame is supported by a single wheel shiftable vertically relative to the frame and operable from the draw bar to effect vertical movement of the rear end portion of the frame in a manner to operate the jack carried thereby relative to the ground against which the jack is to operate.

"Another object of this invention is to provide a lift of the general character referred to wherein the jack element of the mechanism is pivotally connected to the rear end portion of the frame of the carriage and an adjustable stop means normally yieldingly supports the jack in a predetermined position relative to the frame of the carriage.

"It is another object of this invention to provide a lift of the general character referred to including a fluid supply means by which fluid under pressure is supplied to the jack and including safety features and controls making the structure or mechanism safe to use and simple and convenient to operate.

"The structure provided by the present invention is characterized by a wheel supported carriage [having] *comprising* an elongate frame, *the carriage having* front supporting wheels and a single rear supporting wheel. The frame has a flat top extending lengthwise thereof and has side flanges depending from the top defining an elongate cavity that opens downwardly. A head is provided at the forward end of the frame and has arm portions projecting laterally in opposite directions. The front or forward supporting wheels are carried by the arms of the frame and are preferably castered on or to the arms. The single rear supporting wheel is carried by a yoke located in the cavity of the frame. The neck end of the yoke is pivoted to the frame while the arms of the yoke extend rearwardly and at the rear portion of the *frame* [carriage] support an axle that carries the single rear supporting wheel. A spring means, preferably an adjust-

able means, normally yieldingly holds the yoke in a position where the rear supporting wheel projects down from the frame so the frame is supported in a substantially horizontal position. An operating means for the yoke includes a toggle mechanism connecting the yoke and the frame and an operating rod connected to the toggle mechanism and extending forward therefrom to the forward end portion of the frame. The operating rod is adapted to be operated by a draw bar provided at the forward end of the frame and the parts are related so that when the draw bar is lowered to a down position the operating rod actuates the toggle mechanism so that the yoke *pivots on* [is elevated relative to] the frame of the carriage, causing the rear end portion of the carriage to be in a down position. A spring means is provided normally supporting the [yoke in a down posision relative to the frame of the carriage] *carriage frame in a raised position relative to the yoke.*

"A jack is included in the structure and is preferably a hydraulic jack located at the rear end portion of the carriage and connected thereto by a means that provides for pivotal movement of the jack relative to the frame of the carriage. In a typical form the jack has a cylinder pivotally connected to the rear end of the frame of the carriage and a base is provided at the lower end of the cylinder and is adapted to engage the ground. A plurality of ram elements is carried by the cylinder and the elements are telescopically related so that when fluid is supplied to the jack under pressure the ram elements are elevated and extend upwardly from the cylinder so that a head at the upper end of the innermost ram element engages the work to be lifted.

"A fluid supply means is provided and in accordance with the invention includes a fluid reservoir located at the forward end portion of the carriage, a pump mechanism adjacent the reservoir and preferably such as to be manually operated and characterized by a movable cylinder construction by which fluid can be delivered at a substantial rate for rapid operation of the jack, to be followed by high pressure operation. Flexible fluid handling ducts connect the fluid handling parts at the forward end portion of the structure with the jack at the rear end portion of the structure, and suitable control means are included providing a structure convenient and practical to operate.

"The various objects and features of my invention will be fully understood from the following detailed description of a typical preferred form and application of my invention, throughout which description reference is made to the accompanying drawings, * * *."

5. Referring to the Pearne patent drawings reproduced at the end of this report, the portable lift construction illustrated in figures 1–4 includes a mobile wheel supported carriage A, hydraulic jack B, means C such as lugs 84 and members 85 pivotally connecting the jack B to the carriage A, means D including a spring 88, shown best in figure 4, normally and yieldingly stopping the jack B in a predetermined position relative to the carriage A, and lastly, fluid supply means E including a fluid reservoir 100 on the carriage A together with a pump and fluid connections for delivering fluid under pressure to the jack B. As illustrated in the patent drawings, the carriage A is supported by swivel wheels 16 at the front end and is yieldingly supported by a single rear wheel 17 mounted in a yoke 18 which is pivotally connected to the carriage A by pin 40 and helical spring 55. A more detailed description of the portable lift construction illustrated in the patent drawings is contained in the full specification of the reissue patent in suit, reissue patent 24,230.

**876**

6. In actual use of the construction illustrated in the patent in suit, the operator would pull the device by means of the draw bar 20 to the area in which it is to be used. The operator would then use the bar 20 to push the device into position with the ram mechanism of jack B retracted and under the jacking pad of an aircraft landing gear axle. The operator would then close the release valve 107 in the base of the jack B by the control 185 at the front of the device to prevent fluid from flowing from the jack cylinder back to the reservoir 100. The pump mechanism is then operated by manual movement of the handle 127 to force fluid from the reservoir into the pump cylinder to extend upwards the ram portion of the jack into contact with the aircraft landing gear jacking pad indicated by the numeral 10 in figures 1 and 2 of the patent drawings. Continued pumping and extension of the ram forces the base 81 of the jack B downwardly into contact with the ground. The load lifting force is applied directly to the ground surface through the flat bottom 84 of jack base 81 since the jack B is only yieldingly supported off the ground by compression spring 55 between carriage A and yoke 18. Further operation of the pump causes the jack B to lift the aircraft landing gear to a desired height. The jack may be lowered by operation of the control 185 to open the pressure release valve 107 so that fluid in the jack cylinder may return to the fluid reservoir. After the load is thus removed, the spring 55 raises the rearward end of the carriage A and lifts the jack B carried thereby out of contact with the ground. Thereupon the mechanism may be freely moved out from under the landing gear and towed back to storage.

7. The patent in suit also illustrates a mechanical linkage operated by the tow bar 20 for shifting the carriage A so as to engage the base 84 of the jack B with the ground independently of any load on the jack. This mechanical linkage includes toggle links 67 and 69 between the carriage A and the yoke 18 together with an operating rod 73 extending to the front of the carriage for engagement at 75 with an arm 76 projecting from the draw bar 20. When the bar 20 is moved to the down position, the rod 73 is pushed rearwardly to operate the toggle links to shift the carriage downward toward the yoke 18. The patent claims here in suit do not recite this mechanical linkage feature although certain other patent claims not here involved do recite such a linkage.

## The Claims in Suit

8. During the trial, plaintiff elected to rely on claims 2, 6, and 10, carried over from plaintiff's original patent into the reissue patent in suit, and on claims 14, 15, and 16, first granted to plaintiff in the reissue patent. The six claims here in suit are reproduced below with indentations and added emphasis to facilitate identity of the structure recited.

*"Claim 2*

"In combination,

"(a) a vertically shiftable elongate substantially horizontal wheel supported *carriage,*

"(b) a substantially vertical *hydraulic* cylinder and piston *mechanism* pivotally connected to the rear end of the carriage on a horizontal axis extending transversely of the carriage, and

"(c) *means* supplying operating fluid to the cylinder including

"(1) a fluid *reservoir* supported by the carriage at the forward end portion thereof,

"(2) a *pump* having an operating lever accessible at the forward end portion of the carriage, and

"(3) a fluid handling *duct* extending from the pump to the cylinder,

"(d) a rear supporting *wheel* shiftable vertically relative to the rear end portion of the carriage, and

"(e) *means* normally yieldingly holding the wheel and carriage related so the carriage is in an up posi-

tion supporting the cylinder and piston mechanism spaced above the level of the bottom of the wheel.

### "Claim 6

"(Claim 6 is like claim 2 for items (a) through (c) (3) and then continues as follows):

"(d) the carriage having a downwardly opening *cavity* and the duct being located in the cavity.

### "Claim 10

"(Claim 10 is like claim 2 for items (a) through (c) (2) and then continues as follows):

"(d) a flexible *duct* adapted to *deliver* fluid from the pump to the cylinder,

"(e) a flexible *duct* adapted to *return* fluid from the cylinder to the reservoir,

"(f) a manually operable escape *valve* controlling flow from the cylinder to the last mentioned duct, and

"(g) an *operating member* adapted to control said valve and extending therefrom to the forward end portion of the carriage.

### "Claim 14

"In a portable lift, the combination of

(a) a *carriage*,

"(b) *wheels* supporting said carriage,

"(c) an *hydraulic* cylinder and piston lift *mechanism* mounted adjacent one end of said carriage for bodily movement relative thereto, said mechanism comprising

"(1) a *base* having a flat bottom and

"(2) a cooperating *cylinder and piston* mounted on said base for extension and retraction in a direction normal to said flat bottom,

"(d) means on said carriage defining a fluid *reservoir*,

"(e) means for effecting fluid *flow* between said reservoir and said

mechanism for actuating said cylinder and piston,

"(f) a *connection* including yieldable restraining means acting between said carriage and said mechanism to permit movement of the latter relative to said carriage from a normal raised position to a load-lifting position in which said flat bottom engages the ground when a downwardly directed load is applied thereto, said carriage and said hydraulic cylinder and piston mechanism being so related that the carriage remains supported by said wheels when said flat bottom is engaged with the ground.

### "Claim 15

"In a portable lift, the combination of

"(a) a wheel supported *carriage* having a pair of wheels permanently supporting one end thereof in an elevated position,

"(b) an *hydraulic* cylinder and piston lift *mechanism* disposed substantially *beyond* the opposite end of said carriage, said mechanism comprising

"(1) a *base* having a flat bottom and

"(2) a cooperating *cylinder and piston* mounted on said base for extension and retraction in a direction normal to said flat bottom,

"(c) *means* connecting said mechanism to said carriage for bodily movement relative thereto when a load is applied downwardly on said mechanism to engage said flat bottom thereof with the ground, and

"(d) *means* including a third *wheel* yieldably supporting said mechanism with said flat bottom spaced from the ground, said carriage and mechanism being so related that the carriage remains spaced from the ground when the flat bottom of said mechanism has been lowered into engagement therewith.

*"Claim 16*

"(Claim 16 is like claim 15 for items (a) through (b) (2) and then continues as follows):

"(c) *means* connecting said mechanism to said carriage for *pivotal* movement with respect thereto about a horizontal axis extending transversely of the carriage, and

"(d) *means* including a third *wheel* for yieldably supporting said mechanism and the adjacent end of said carriage in elevated positions, said mechanism and said carriage being normally disposed at such relative elevations that lowering of said adjacent end of the carriage in opposition to said yieldable means will engage the flat bottom of the base of said mechanism with the ground.

### "Validity

"9. Defendant has urged that the reissue patent in suit is invalid for lack of novelty and lack of patentable advance over the prior patents issued to—

"Sonderup.. 2,173,598
                September 19, 1939.
"Grime..... 2,479,679
                August 23, 1949."

Each of these patents was issued more than 1 year prior to the filing date, January 17, 1952, of the original Pearne application for letters patent. Neither of these patents was cited in the prosecution of the original Pearne application or in the prosecution of the reissue Pearne application while in the United States Patent Office. The drawings of these two prior patents are reproduced at the end of this report.

10. In referring to the "forward" and "rear" ends of a jack construction, the terminology used in the Sonderup and Grime patent specifications is the reverse of that used in the patent in suit. As used in the patent in suit and in this report, the front end of the jack construction is toward the operator and the tow bar or handle where one is provided. The rear end of the jack construction is the portion inserted under the object to be elevated and generally includes the hydraulic cylinder and piston mechanism.

11. The Sonderup patent discloses an automobile type hydraulic jack with a carriage. Referring to the Sonderup patent drawings at the end of this report, the jack 16 is provided with a flanged base 20 removably positioned between side rails 21 on the carriage base 23, as shown in figure 4. The Sonderup patent specification teaches that the carriage portion may be sold separately to motorists who already have a jack, but also discloses that the jack base and the carriage base may be integral if desired. The Sonderup jack carriage is provided at one end with a pair of oppositely disposed wheels 47 mounted on stub axles 48 carried at the ends of leaf springs 50, the latter being secured at 51 to flanges on the side rails of the carriage base 23. The Sonderup jack carriage is also provided with a removable tube 32 having a pivotally mounted stub lever 36 and a rock lever 39 for operating the hydraulic pump mechanism through push-pull rod 38 and a bell-crank 26. The tube 32 must be manually lifted when the jack and carriage are to be moved to a new location. When the jack 16 is not loaded, the spring mounted wheels 47 raise only one end of the carriage base 23 off from the ground. When the jack is loaded in use, the entire carriage is pressed down against the ground to support the load. A fluid release or by-pass valve operable by a key 41 is controlled by the foldable rod construction including rod 44 pivotally connected to rod 42. The Sonderup jack and carriage construction does not provide for pivotal or bodily movement of the jack with respect to the carriage. The Sonderup carriage 23 is wheel supported at only the rear end, and the forward end must be manually lifted to move the carriage to a new location. The portable jack construction disclosed in the prior Sonderup patent does not include structure like or similar to the several elements specifically recited and defined in combination in each of the

six Pearne reissue patent claims here in suit.

12. The Grime patent discloses portable lifting apparatus described as applicable to the hub or outside arm of the landing wheel of an airplane. Referring to the Grime patent drawings at the end of this report, the apparatus includes a portable frame 1 supported on four caster wheels 42 and 43 and steadied by a pair of swingable lateral extensions or outriggers 38 having feet 40, illustrated in figure 3. Each of the four caster wheels 42 and 43 is spring mounted so that when the jack is loaded the foot plates 12 and 12a of the frame 1 engage the ground. The jacking mechanism includes a cylinder 17 pivotally connected to the triangular plates of a slidable carriage 6, the carriage being adapted to slide fore and aft in the frame 1 on rollers 7 and 9. The piston rod 19 is connected to triangular lever plates 25 forming part of a parallel motion linkage system supporting the load seat member 23. The slidable carriage 6, levers 25, links 29, and the load seat 23 are proportioned so that seat face 24 of the load seat 23 may be raised or lowered in a vertical direction over the clearance space 16 beyond the rear end of plate 12. The Grime patent construction provides a flexible hose 37 between the cylinder 18 and the hydraulic pumps 34 and 35 since the carriage 6 may slide fore and/or aft within the frame 1 during operation of the jack. In the Brime patent construction the load is transmitted by the slidable carriage 6 through the rollers 7 and 9 to the frame 1 which rests on the ground. When the Grime apparatus supports a load with the carriage 6 in the projecting position illustrated in figure 1 of the patent drawings, the carriage 6 is free to move laterally to the left in frame 1 on said rollers 7 and 9. The portable jack construction disclosed in the prior Grime patent does not include structure like or similar to the several structural elements specifically recited and defined in combination in each of the six Pearne reissue patent claims here in suit.

13. The prior Sonderup patent does not disclose a cylinder and piston mechanism pivotally connected to the rear end of the carriage as recited in claims 2, 6, and 10 in suit, nor such a mechanism mounted for bodily movement relative to the carriage as recited in claim 14, nor such a mechanism disposed beyond the end of the carriage and having means connecting the mechanism to the carriage for bodily movement relative to the carriage when a load is applied as recited in claim 15, nor means connecting the cylinder and piston mechanism to the carriage for pivoted movement as defined in claim 16. Likewise, the Sonderup patent does not disclose the rear wheel as recited in claim 2 in suit, nor the downwardly opening cavity recited in claim 6, nor the flexible duct recited in claim 10, nor the third wheel defined in claims 15 and 16, nor a pair of wheels permanently supporting one end of the carriage in an elevated position as recited in claims 15 and 16. The carriage of the Sonderup patent construction is not fully wheel supported.

14. The prior Grime patent does not disclose a substantially vertical hydraulic cylinder and piston mechanism pivotally connected to the rear end of a wheel supported carriage as recited in claims 2, 6, and 10 in suit, nor the cylinder and piston mounted for extension and retraction in a direction normal to the flat bottom as recited in claim 14, nor such a mechanism disposed substantially beyond one end of the carriage as recited in claim 15, nor a pair of wheels permanently supporting one end of the carriage in elevated position as defined in claims 15 and 16. On direct examination, defendant's expert witness Cromp testified in relation to claims 15 and 16 in suit that he did not find a hydraulic cylinder and piston lift mechanism disposed substantially beyond the opposite end of the carriage in either the Sonderup or Grime patents. Certain other features recited specifically in the several patent claims here in suit are likewise not disclosed or taught in the Sonderup and Grime pat-

ents either individually or in combination.

15. Summarizing, the two prior patents to Sonderup and Grime, identified in finding 9, do not anticipate the invention defined in the several claims here in suit. Considered alone or in combination, the disclosures of these two prior patents would not render the subject matter of any of the several patent claims in suit obvious at the time the invention was made to one having ordinary skill in the art to which the said subject matter pertains.

16. Defendant has urged that the reissue patent in suit is invalid on the ground that the expiration of plaintiff's design letters patent on June 23, 1956, dedicated to the public the subject matter claimed in the reissue patent. United States Design Patent No. 168,473, issued December 23, 1952, for a term of 3½ years, in the name of Frank S. Pearne as assignor to plaintiff. This design patent claims the ornamental design for a jack shown therein and contains no teaching other than as illustrated in the design patent drawings. Said design drawings are different from those contained in the reissue patent in suit. The design patent drawings did *not* teach or disclose to one having ordinary skill in the jack art constructional details such as the following:

"(a) a hydraulic cylinder and piston mechanism pivotally or otherwise yieldably connected to a wheel supported carriage so as to permit relative movement of these two parts,

"(b) a fluid reservoir mounted on or in any part of the jack structure,

"(c) a fluid supply duct, however connected, and flexible or rigid or a separate return duct,

"(d) yieldable means supporting the carriage on any of the wheels or any other provision for vertical shiftability of the carriage,

"(e) a downwardly opening cavity defined or formed by the carriage, or

any fluid handling duct located therein,

"(f) a manually operable escape valve controlling fluid flow from the cylinder and piston mechanism back to a fluid reservoir,

"(g) a forwardly extending operating member for a manually operable escape valve, or

"(h) yieldable means acting between the carriage and the cylinder and piston mechanism for holding said mechanism in a predetermined position relative to the carriage."

Each of the several claims in suit, finding 8, recites at least one of the above-listed features not shown or described in plaintiff's expired design patent. One following the disclosure of the design patent would not necessarily infringe the reissue patent claims in suit. One following the disclosure of the reissue patent in suit and the claims thereof in suit would not necessarily produce a jack having the design shown in plaintiff's design patent. The subject matter of the reissue patent claims in suit was not dedicated to the public upon the expiration of plaintiff's design patent.

17. Defendant has urged that the reissue patent in suit is invalid on the ground of double patenting. Plaintiff's design patent, identified in finding 16, claimed "The ornamental design for a jack, as shown." The jack design shown therein is different in appearance from the jack construction illustrated in the drawings of the reissue patent in suit. The design patent and the reissue patent are for different inventions. The design claimed in the design patent includes jack constructions that do not contain the combination of structural features specifically disclosed and claimed in the mechanical reissue patent in suit. Conversely, jack constructions, including the combination of structural features claimed in the reissue patent, need not resemble in appearance the design claimed in the design patent. The design patent application was filed in the United States Patent Office on June 26, 1954, 5 months

after the mechanical patent application was filed which resulted in plaintiff's original patent before its reissue. The mechanical and design patent applications were copending in the Patent Office.

18. Defendant has urged that the reissue patent in suit is invalid on the ground that the features of the patent were individually old in the art. As showing the *state of the art,* defendant has referred to the following 19 prior patents:

| | | |
|---|---|---|
| Lindsay | 16,801 | March 10, 1857. |
| Robertson | 24,759 | July 12, 1859. |
| Brinckerhoff | 165,472 | July 13, 1875. |
| Caldwell | 569,574 | October 13, 1896. |
| Tuggle et al | 732,142 | June 30, 1903. |
| Apgar | 884,884 | April 14, 1908. |
| Whitton | 1,342,140 | June 1, 1920. |
| Hawkinson | 1,437,055 | November 28, 1922. |
| Leisse | 1,441,628 | January 9, 1923. |
| Hawkinson | 1,489,759 | April 8, 1924. |
| Vickers | 1,728,088 | September 10, 1929. |
| Jakob | 1,734,582 | November 5, 1929. |
| Weaver | 1,852,544 | April 5, 1932. |
| Manley | 1,948,073 | February 20, 1934. |
| Kelly | 1,955,635 | April 17, 1934. |
| Niederhauser | 2,594,270 | April 22, 1952 (filed August 6, 1947). |
| Felderman et al | 2,656,057 | October 20, 1953 (filed May 8, 1947). |
| Morrow | 2,597,086 | May 20, 1952 (filed May 10, 1947). |
| Ball | 2,596,462 | May 13, 1952 (filed November 21, 1947). |

19. Most of the patents in the above group relate to hydraulic jacks and/or attachments for such jacks. The last three listed relate to timber setting machinery. None of the several patents disclose in a combination each of the elements defined and recited in the reissue patent claims here in suit. None of these patents disclose a portable lift construction operable in the same manner or for the same purpose as the construction defined in the patent claims in suit. These state of the art disclosures do not disclose each and every element individually or in combination as specifically defined in the claims in suit. It would not have been obvious to one skilled in the jack art, at the time the Pearne invention was made, to select a feature or features from each of several of these art patents for combination into a structure as recited in the reissue patent claims. Such a combination or assembly of selected features would be the result of hindsight after knowledge of the Pearne patented jack construction. The reissue patent claims here in suit are not invalid over the state of the art patents cited by defendant herein.

20. During the prosecution of the Pearne original, design, and reissue patent applications in the United States Patent Office, the patent examiners cited the Tuggle, et al. patent and the Niederhauser patent listed above, as well as a number of other prior patents which are not specifically urged by defendant here.

21. Defendant has urged that the terminology "vertically shiftable", recited in claims 2, 6 and 10 of the patent in suit, must be considered as limiting the scope of said claims to a construction including a mechanical structure to positively raise or lower the carriage and jack with respect to the ground. The Pearne reissue patent drawings show a mechanical linkage including toggle links 67 and 69, mentioned in finding 7 above, and such a linkage is a mechanical structure for raising or lowering the carriage A. The specification of the reissue patent, and also that of the original patent state:

"If desired the base 81 of the jack can be engaged with the ground or it can be lowered prior to the jack being operated, or following operation of the jack and lifting of the load or aircraft, as circumstances may require. * * *"

Examination of a copy of the application file for the original Pearne patent in which claims 2, 6, and 10 were first presented and allowed, shows that the words "vertically shiftable" were inserted in the several pending claims by an amendment. Claim 4 of the original and of the reissue patent, a claim not here in suit, specifically recites means adapted to operate the wheel relative to the carriage to a position, etc., and claim 5, not here in suit, specifically recites a toggle mechanism adapted to move the yoke toward the carriage and an operator adapted to operate the toggle mechanism, etc. When inserting the words "vertically

shiftable" in the pending claims, applicant's counsel pointed out that claim 4 is limited to means adapted to operate the wheel to a position where the jack is flush with the bottom of the wheel, and that claim 5 is limited to include a toggle mechanism adapted to move the yoke toward the frame. Such remarks do not limit claims 2, 6, and 10 by implication or designation to mechanical structure for mechanical shifting of the carriage as distinguished from normal vertical shiftability inherent in and permitted by a pivotal mounting and a yieldable spring holding means. Plaintiff is not estopped by file history amendments and remarks from asserting that claims 2, 6, and 10, reciting "vertically shiftable" are broad enough to include a construction in which the jacking operation itself shifts the carriage downward as well as a construction including a mechanical linkage for manually accomplishing the same result when desired.

22. Defendant has urged that the reissue patent in suit is invalid on the ground that Frank S. Pearne was not the first inventor of the subject matter disclosed and claimed therein. Prior to 1951, said Pearne was an engineer associated with Pearne & Lacy Machine Company, engaged in designing and engineering work. Pearne also was associated informally then with Regent Manufacturing Company which engaged in the fabrication and assembly of structural parts and in sales activities. During 1951, Regent Jack Mfg. Co., Inc., plaintiff herein, was formed with Frank S. Pearne as chief engineer in full charge of engineering. During 1951, Orlin A. McPeek, general manager of Regent Jack Mfg. Co., was contacted by Douglas Aircraft Company concerning the problem of jacking the relatively heavy DC–6 type of aircraft. When Pearne and McPeek visited the Douglas Aircraft Company plant at Santa Monica, California, they were shown such an aircraft and measured the distance between the floor and the jacking pad, and the distances between brake drums and other components. The problem required a jack of 25-ton capacity to work within an envelope 7 inches high and 5¼ inches wide between two flat tires on the dual wheels of the DC–6 aircraft landing gear. The said Pearne then developed the portable axle jack shown on Regent Jack Mfg. Co., drawing No. 993–A, dated May 12, 1951. The jack shown on this drawing is similar to that shown in the reissue patent drawings but does not include the toggle linkage for mechanically shifting the carriage position. The drawing indicates that the jack is of 25-ton capacity for Douglas DC–6, DC–6A, and DC–6B aircraft. There is evidence that Regent Jack Mfg. Co., received from Douglas on May 14, 1951, a purchase order for six of these jacks. The Pearne application for letters patent was filed in the United States Patent Office on January 17, 1952. There is no competent evidence that Pearne was not the first inventor of the subject matter defined in the six reissue patent claims in suit.

23. Subsequent to the development of a jack for Douglas DC–6 type aircraft, plaintiff developed other generally similar jacks of various capacities and lifts. By a purchase order dated November 24, 1951, Douglas ordered two Regent model 993 25-ton jacks for use by defendant. By purchase order dated September 30, 1952, Lockheed Aircraft Corporation ordered one Regent model 1905 25-ton jack for defendant's U.S. Air Force. Other Regent axle jacks were ordered during 1952 and later by various aircraft manufacturers for use by defendant's Services. Plaintiff's Regent model 995 jack was similar to model 993, but was of 50-ton capacity and provided with double-acting pump systems. Model 993 was also developed during late 1951 by Frank S. Pearne at the request of Douglas to meet the requirements of the C–124 aircraft. This model 993 portable jack includes the toggle linkage mechanism for mechanically moving the carriage vertically, such as illustrated in the drawings of the reissue patent in suit. During late 1951, plaintiff demonstrated its model 995 portable jack at plaintiff's expense to defendant's Department of the Air Force at

Wright Field, Dayton, Ohio. By purchase order dated June 20, 1952, Douglas ordered 125 Regent model 995 axle jacks for the Department of the Air Force.

24. Plaintiff was awarded an Air Force contract on June 2, 1952, AF 33 (600)–19371, to conduct engineering design study of jack assemblies and to make preliminary designs, fabricate, test, and deliver to Wright-Patterson Air Force Base, one jack assembly in each of five stated capacities, namely, 5-, 10-, 20-, 35-, and 50-ton capacity. The contract amount specified was not to exceed $22,-027.20. This contract included a conventional clause entitled "Patent Rights" in which plaintiff granted defendant a royalty-free license to practice each invention conceived or first actually reduced to practice in the performance of the contract work or work done upon the understanding that a contract would be awarded. The invention defined in the several reissue patent claims here in suit was not conceived or reduced to practice for the first time during the contract work, but was conceived and actually reduced to practice prior to the filing of the Pearne application for letters patent on January 17, 1952, and prior to the Air Force contract dated June 2, 1952. The invention here in suit was not made in contemplation of obtaining an Air Force development contract. Defendant did not secure any license from plaintiff under the invention defined in the patent claims here in suit.

25. After the award to plaintiff of said Air Force contract AF 33(600)–19371, and after plaintiff's Regent model 995 jack had created interest and had become generally used throughout the aircraft industry and defendant's military services, but before completion by plaintiff of the work called for by said contracts, plaintiff responded to an Air Force request for a price on 48 jacks of 50-ton capacity conforming to Air Force specification MIL–J–8245 (USAF), dated March 26, 1953, by quoting the price on Regent model 995. Upon being advised by the Air Force that the quoted price was too high plaintiff undertook to sim-

plify the structure of Regent model 995 jack to reduce its cost, and produced Regent model 1946. Regent model 1946 is shown in more detail in Regent Jack drawing D–1946–A. On June 24, 1954, plaintiff was awarded an Air Force contract for 48 of the Regent model 1946 jacks. The model 1946 jack does not include any mechanical linkage for positively shifting the jack base vertically.

26. After plaintiff had supplied a Regent model 1946 jack for preliminary testing under the Air Force contract for 48 jacks, plaintiff was requested to substitute jacks of the same design for the 35- and 50-ton jacks being supplied under plaintiff's earlier Air Force contract AF 33(600)–19371, plus an added lowering device similar to that previously used by plaintiff on Regent model 995. The lowering device provides for mechanically lowering the ram mechanism into engagement with the ground as an aid in disengaging the jack for removal from under the landing gear axle. Plaintiff's earlier contract was thereupon modified for this purpose, the necessary changes being effected by a supplemental agreement dated January 19, 1956.

27. Defendant has urged that the reissue patent in suit is invalid on allegations that errors in the original letters patent did not arise by inadvertence, accident or mistake; that the reissue is based on a misleading oath, and that new matter was introduced into the application for the reissue patent. In the oath accompanying his application for the reissue, Frank S. Pearne stated in part:

"  *  *  * That he believes the aforesaid original patent to be partly inoperative to fully and properly protect said invention by reason of the patentee's having claimed less than he had a right to claim in the patent in that, at all stages in the prosecution of the application on which said original patent was granted, the claims presented were inadequate to cover the invention, said inadequacy being due to the fact that all of said claims contained restrictive limita-

tions directed to features of the subject matter disclosed that fulfill certain restricted objects of the invention but are relatively incidental to the primary objects of the invention and the means for accomplishing the same, as broadly identified and pointed out in said patent in column 3, lines 16–24 thereof and as more specifically defined in the newly presented claims contained in the accompanying application for reissue of said original patent.

"That such restrictive limitations were included in all of the claims of said original patent due to inadvertence and mistake of applicant's previous attorney, who apparently failed to appreciate the scope and breadth of the invention, and due to applicant's lack of sufficient familiarity with patent matters and principles of patentability and claim interpretation to appreciate how said original patent was unduly restricted in scope; and that applicant originally intended to apply for a patent on said invention which was not so restricted and believed that the claims presented in the application on which said patent was granted, and ultimately allowed therein, were not so restricted.

"That applicant was first informed, in part, of the restricted nature of the claims granted in said original patent on or about April 13, 1956, in the form of a written evaluation of said original patent by counsel other than the attorney who prepared and prosecuted the application for said original patent; that said other counsel more fully pointed out how the invention should have been more broadly claimed in a further communication received by applicant on or about May 7, 1956, in which communication said other counsel recommended that the accompanying reissue application be prepared and filed; that applicant authorized said other counsel to prepare the recommended reissue application in a com-munication transmitted to said other counsel May 10, 1956; and that the accompanying reissue application is being filed herewith as promptly as it could be handled for applicant, residing in Alhambra, California, and by said other counsel, having offices in Cleveland, Ohio.

"That the restrictions of the claims of said original patent as set forth above were inadvertent and arose without any deceptive intention on the part of applicant. * * *"

The reissue oath is not misleading. The changes made in the specification, some of which are shown in finding 4 herein, do not constitute new matter not disclosed in the original specification. The changes in the specification do not alter the meaning or scope of the original patent claims 2, 6, and 10, repeated in the reissue patent verbatim. There is no competent evidence that errors in the original letters patent arose from reasons other than inadvertence, accident or mistake.

28. Summarizing findings 9 through 27, plaintiff's reissue patent claims 2, 6, 10, 14, 15, and 16, here in suit, are found to be valid over the several defenses urged by the defendant herein.

### Infringement

29. Three jack constructions accused by plaintiff as infringements of the patent in suit are shown on engineering drawings of the Smith-Nelson Corporation, Santa Barbara, California, identified as follows:

Dwg. No. 5014–51AF—Jack, Hand, Aircraft, Hydr., Axle, 50 Ton Cap. Type F 3, 6–4–56.

Dwg. No. 5014–51AF—Assembly, Axle Jack, 50 Ton, 10–14–53.

Dwg. No. 3510–50N—Assy., Axle Jack, 2–17–54.

The two drawings numbered 5014–51AF depict two versions of Smith-Nelson Corporation jack model 5014–51AF. The drawing numbered 3510–50N depicts Smith-Nelson Corporation jack model

3510–50N. A portion of the 1956 drawing first listed above is reproduced at the end of this report.

30. By an Air Force contract No. AF 33(602)–4521, awarded June 30, 1953, the Air Force purchased 342 aircraft axle jacks, 50-ton capacity, manufactured for the United States by Smith-Nelson Corporation in accordance with drawing No. 5014–51AF dated October 14, 1953. Deliveries of the jacks called for under that contract were completed in February of 1956. By an Air Force contract No. AF 33(602)–7668 awarded April 28, 1956, the Air Force procured aircraft axle jacks manufactured for the United States by Smith-Nelson Corporation in accordance with drawing No. 5014–51AF dated June 4, 1956. By an Air Force contract No. AF 33(602)–7708 awarded May 3, 1956, the Air Force procured spare parts, manufactured for the United States by Smith-Nelson Corporation for the model 5014–51AF jack shown in the drawing of that number dated October 14, 1953. By a Navy contract No. N383s–671A awarded April 1, 1954, for 59 axle jacks, the Navy procured aircraft axle jacks manufactured for the United States by Smith-Nelson Corporation in accordance with drawing No. 3510–50N. This contract was awarded following a request for bids specifying these jacks as follows: "Axle hydraulic pressure, 35 ton capacity * * * to be in accordance with part No. 1921 of Regent Jack Mfg. Co., Inc., or equal." By a Navy contract No. N383s–15050A awarded April 26, 1955, for 58 axle jacks, the Navy procured aircraft axle jacks manufactured for the United States by Smith-Nelson Corporation in accordance with drawing No. 3510–50N. This contract was awarded following a request for bids specifying these jacks as follows: "Jack, Axle, hydraulic, 35 ton capacity * * *. To be in accordance with Regent Model 1921 and [sic] Smith-Nelson Model 3510–50N or equal." By a Navy contract No. N383–31457A awarded April 30, 1956, for 83 axle jacks, the Navy procured aircraft axle jacks manufactured for the United States by Smith-

Nelson Corporation in accordance with drawing No. 3510–50N. This contract was awarded following a request for bids specifying these jacks as follows: "Jack, Axle—hydraulic 35 ton capacity * * *. To be in accordance with Regent Model 1921 and [sic] Smith-Nelson Model 3510–50N or equal."

31. Defendant did not deny, and offered no evidence to refute, continued use by defendant, up to the date of the filing of the petition herein, of accused jacks purchased by defendant under each of the several contracts identified in finding 30. All of the aforementioned contracts for the manufacture of the accused devices and sale thereof to defendant were entered into within a period preceding the filing of plaintiff's petition herein.

32. Referring to the plan and elevational views of the 1956 Smith-Nelson model 5014–51AF reproduced at the end of this report, this model includes a vertically shiftable elongate substantially horizontal wheel supported carriage designated by the added reference numeral 1 enclosed in a circle. A substantially vertical hydraulic cylinder and piston mechanism 2 is pivotally connected to the carriage 1 by a pin 3 on a horizontal axis extending transversely of the carriage 1. Operating fluid for the cylinder and piston mechanism 2 is contained in a reservoir supported in the forward end of the carriage 1 and is indicated in the elevational view by the reference numeral 4. The accused construction includes fluid pumps 5 provided with operating levers 6 at the front of the carriage 1. The pumps 5 are connected to the cylinder assembly 2 at point 8 by a fluid handling duct 7 shown in the elevational view. A rear supporting wheel 10 shiftable vertically relative to the rear end portion of the carriage 1 is provided to allow the base of the hydraulic cylinder and piston mechanism 2 to directly contact the ground when the jack is loaded. The rear supporting wheel 10 is pivotally connected to the rear portion of the carriage 1 by a transverse pin connecting it to the base of the cylinder and piston mechanism 2 which is pivotally

connected to the carriage 1 by transverse pin 3. There is a coil spring 11 which normally and yieldingly urges rear wheel 10 downward relative to the hydraulic cylinder and piston mechanism 2, and there is a pair of springs 12 positioned between the hydraulic cylinder and piston mechanism 2 and a portion of the carriage 1. The springs 11 and 12 constitute a means normally holding the wheel 10 and carriage 1 related so that the carriage 1 is in an "up" position supporting the hydraulic cylinder and piston mechanism 2 with its base spaced above the level of the bottom of wheel 10, i. e., spaced above the surface of the ground when the jack is not bearing a load. This "up" position of the hydraulic cylinder and piston mechanism is shown in the elevational view of the accused Smith-Nelson model 5014–51AF axle jack at the end of this report.

33. The accused Smith-Nelson model 5014–51AF axle jack described in detail in finding 32 includes all the parts and elements set forth in claim 2 of plaintiff's reissue patent 24,230, tabulated in finding 8. Those parts and elements in the Smith-Nelson construction function in the same manner to produce the same results. Claim 2 in suit has been infringed by defendant's unlicensed use of the Smith-Nelson model 5014–51AF 50-ton capacity axle jack.

34. Referring again to the elevational view of the Smith-Nelson model 5014–51AF reproduced at the end of this report, the carriage 1 includes a downwardly opening cavity 13, shown best in a cutaway section. The fluid handling duct 7 is located in said cavity 13. A return fluid duct including its connection 18 to the reservoir 4 is also located in the cavity 13. Claim 6 of the reissue patent is similar to items (a) through (c) (3) of claim 2 and adds a recital of a cavity and that the duct is located therein, as more fully set forth in finding 8. Claim 6 has been infringed by defendant's use of the Smith-Nelson model 5014–51AF axle jack.

35. In the model 5014–51AF construction, the duct 7 is a flexible hose and delivers fluid from the pumps 5 to the cylinder and piston mechanism 2 through one of the connections indicated by the numeral 8. A second flexible duct extends from the cylinder and piston mechanism 2 through one of the connections 8 to a return connection indicated by the numeral 18. The model 5014–51AF construction also includes a manually operable escape valve 17 controlled by an operating member 16 at the front end of carriage 1. Claim 10 of the reissue patent is similar to items (a) through (c) (2) of claim 2 and adds a recital of the flexible ducts, the escape valve and the operating member. Claim 10 has been infringed by defendant's use of the Smith-Nelson 1956 model 5014–51AF axle jack.

36. The model 5014–51AF jack provides in a portable lift the combination of six parts or elements recited in claim 14 of the reissue patent. These parts are identifiable in the model 5014–51AF construction as a carriage 1, wheels 15, cylinder and piston mechanism 2 adjacent one end of the carriage 1 for bodily movement on pin 3 and including a base having a flat bottom with the cylinder and piston mounted for extension and retraction in a direction normal to the flat bottom of mechanism 2, a reservoir 4, pumps 5 for effecting fluid flow, and a connection including pin 3 and springs 12 acting between the carriage 1 and the mechanism 2 to accomplish the operation defined in said claim. Claim 14 of the reissue patent has been infringed by defendant's use of the Smith-Nelson model 5014–51AF axle jack.

37. Claim 15 in suit is generally similar to claim 14 but omits the reservoir and pump. Claim 15 adds a recital of means including a third wheel yieldably supporting the cylinder and piston mechanism as fully set forth in finding 8. The model 5014–51AF jack includes a third wheel 10 yieldably supporting the mechanism 2 through a pivot and spring connection. The construction is such that the carriage 1 remains spaced from the ground when the base of mechanism 2 engages the ground under load.

Claim 15 of the reissue patent has been infringed by defendant's use of the Smith-Nelson model 5014–51AF axle jack.

38. Claim 16 in suit is similar to claim 15 but specifies that the connections between the cylinder and piston mechanism and the carriage provide for pivotal movement on a horizontal axis and that the third wheel yieldably supports the cylinder and piston mechanism and the adjacent end of the carriage. In the accused model 5014–51AF construction the connection pin 3 provides for pivotal movement on a horizontal axis. The third wheel 10 taken with its yieldable connection to the cylinder and piston mechanism 2 and with the yieldable connection of the latter to the carriage 1 through pin 3 and springs 12, constitute means for yieldably supporting the mechanism 2 and the end of the carriage 1 in the elevated position illustrated in the elevational view. When the mechanism 2 is lowered to engage its base with the ground by the application of a load, the adjacent end of the carriage 1 is also lowered by pin 3 in opposition to the yieldable springs 12. Claim 16 of the reissue patent has been infringed by defendant's use of the Smith-Nelson model 5014–51AF axle jack.

39. Summarizing, the Smith-Nelson model 5014–51AF axle jack includes all the parts and elements set forth in claims 2, 6, 10, 14, 15, and 16 of plaintiff's reissue patent 24,230, and those parts and elements function in the same manner to produce the same results. Claims 2, 6, 10, 14, 15, and 16 have been infringed by defendant's unlicensed use of the Smith-Nelson 1956 model 5014–51AF axle jack.

40. The 1953 version of the Smith-Nelson model 5014–51AF axle jack shown on the drawing of that number dated October 14, 1953, is generally similar to the 1956 version described in finding 32 and illustrated in views reproduced at the end of this report. In the earlier version there is only one flexible duct between the cylinder and piston mechanism at the rear of the carriage and the pumps and escape valve at the front of the carriage. The single duct is utilized to conduct fluid from the pumps to the cylinder and also to return the fluid from the cylinder through an escape valve into the reservoir. The 1953 version of Smith-Nelson model 5014–51AF axle jack includes all the parts and elements set forth in claims 2, 6, 14, 15, and 16 of plaintiff's reissue patent, and those parts and elements function in the same manner to produce the same results. The separate ducts and escape valve between the cylinder and a return duct, recited in claim 10, are not present in the 1953 axle jack. Claims 2, 6, 14, 15, and 16 have been infringed by defendant's unlicensed use of the Smith-Nelson 1953 model 5014–51AF axle jack.

41. The Smith-Nelson model 3510–50 N axle jack shown on the drawing of that number dated February 17, 1954, is also generally similar to the 1953 model 5014–51AF jack described above. In the model 3510–50N jack, there is only one flexible duct between the cylinder and piston mechanism at the rear end of the carriage and the pumps and escape valve located in this model immediately aft of the transverse forward portion of the carriage. As in the 1953 model 5014–51AF jack, the single duct in the 1954 model 3510–50N jack is utilized to conduct fluid both to and from the cylinder and piston mechanism. The 1954 Smith-Nelson model 3510–50N axle jack includes all the parts and elements set forth in claims 2, 6, 14, 15, and 16 of the plaintiff's reissue patent, and those parts and elements function in the same manner to produce the same results. The 1954 model 3510–50N jack does not have separate ducts and the escape valve location specified in claim 10. Claims 2, 6, 14, 15, and 16 have been infringed by defendant's unlicensed use of the Smith-Nelson model 3510–50N axle jack.

See Conclusion of Law on page 892.

GRIME

2,479,679

*Fig.1*

*Fig.2*

PEARNE

Reissue 24,230

PEARNE

Reissue 24,230

SONDERUP
2,173,598

Fig.1.
Fig.2.
Fig.3.
Fig.4.
Fig.5.

GRIME
2,479,679

Fig. 3
Fig. 4

SMITH—NELSON CORPORATION

50 TON AXLE JACK

ELEVATIONAL VIEW

SMITH-NELSON CORPORATION
50 TON AXLE JACK
PLAN VIEW

### Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment will be entered to that effect.

The amount of recovery will be determined pursuant to Rule 38(c) of the Rules of this court.